*141 OPINION.
Phillips :
Petitioner contends that upon organization it acquired, in exchange for its capital stock, a contract to manufacture 3,000 guns which had a fair market value of $1,000,000, that this represented the cost to it of such contract, and that it is entitled to a deduction for the exhaustion of such cost at the rate of $333.33 per gun manufactured. The respondent contends that all that was assigned to the corporation at organization was a contract to construct a building and install suitable machinery to produce guns, that at that time no order for guns had been placed with Symington and that *142 such order was thereafter placed directly with the petitioner; further, the Commissioner contends that if we hold there was a contract to manufacture guns, it cost the petitioner nothing.
Without determining whether there was in fact any contract, we are of the opinion that no value or cost has been established. Although both Symington and Anderson testified that the contract had a value of $1,000,000 when transferred to the corporation, it appears from other testimony given by them that this was merely another way of stating that if all the guns were manufactured, the minimum profit would be $1,000,000. It appears, however, that the Government reserved the right to cancel at any time, and did in fact cancel after the Armistice, after only about one-third of the guns called for had been finished. In the case of cancellation, the profit stopped, except as to the work already done. Anyone considering the purchase or sale of such a contract could not fail to recognize that the estimated profit was uncertain.
It is contended that the provision of the contract giving to petitioner one-third of the saving resulting from a cost less than $2,625 per gun gave added value to the contract. It is in evidence that guns were produced for less than this amount, despite a costly change from American to French 75 m/m guns. No doubt the officers of petitioner hoped, through the unusual mechanical skill of Symington and Anderson, to realize on this clause, but the possibility at the time the contract was under negotiation does not seem to have been very encouraging, for Symington testifies:
Q. Were you told by the Government’s Agent at Washington, with whom you dealt, what the Arsenal cost of manufacturing similar guns was?
A. I was told that that was the estimate based on cost and studies in the production of that gun, and I was further told that the cost of $2625 was made after due consideration was given to the fact that a large number of guns could be produced at a much less cost than a few guns, so that my inpression was and I so told them that they had made a very low figure for me to shoot at, to which they agreed.
It was because Symington and Anderson were known to be capable of carrying out the contract that it was awarded to them. We do not question for a moment that, combined with their financial standing, their skill and their ability to secure and hold an adequate organization, the contract promised to be valuable. Standing alone as a contract, we doubt if there was any considerable value, for the contract had just been negotiated in a transaction between two parties dealing at arm’s length. The Government was seeking such production and presumably any one who could have assured the officials of his ability to perform such a contract might have obtained one. It *143 is not to be assumed, and we believe that Symington and Anderson would be the last to ask us to assume, that they obtained something from the Government that others could not have obtained if able to perform. The principal asset the petitioner possessed was, we are convinced, the services of these two men and the organization they developed. It was this which led the officials to give them the contract and, with such a situation existing, the petitioner would undoubtedly have been in a position to obtain such a contract direct, had there been none to assign to it.
We are of the opinion that the petitioner is not entitled to any deduction for exhaustion of the contract.
We come then to consider the claim for assessment under the provisions of sections 327 and 328 of the Revenue Act of 1918. Section 327 provides as follows:
Sec. 327. That in the following cases the tax shall be determined as provided in section 328:
(a) Where the Commissioner is unable to determine the invested capital as provided in section 326;
(b) In the case of a foreign corporation;
(c) Where a mixed aggregate of tangible property and intangible property has been paid in for stock or for stock and bonds and the Commissioner is unable satisfactorily to determine the respective values of the several classes of property at the time of payment, or to distinguish the classes of property paid in for stock and for bonds, respectively;
id) Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the tax computed by reference to the representative corporations specified in section 328. This subdivision shall not apply to any case (1) in which the tax (computed without benefit of this section) is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital, nor (2) in which 50 per centum or more of the gross income of the corporation for the taxable year (computed under section 233 of Title II) consists of gains, profits, commissions, or other income, derived on a cost-plus basis from a Government contract or contracts made between April 6. 1917, and November 11, 1918, both dates inclusive.
The Commissioner denied that petitioner fell within this section, claiming that more than 50 per cent of its income was derived from cost-plus contracts. Petitioner asserts that the contract here involved contemplated a fixed profit per gun and a share in the savings, is not a cost-plus contract as such term is generally used, that there are abnormalities of income and invested capital which bring it within subdivision (d) of this section and that in any event it falls within subdivision (a). In his brief the Commissioner contends that *144 if there is a cost-plus contract, petitioner can not have his tax computed under section 328. In this he is clearly in error, since the provision relating to cost-plus contracts is contained only in subdivision (d) of the section and by its express provisions is confined in its operation to that subdivision. The other subdivisions are free of any such limitation.
Section 331 of the statute provides as follows:
In the case of the reorganization, consolidation, or change of ownership of a trade or business, or change of ownership of property, after March 3, 1917, if an interest or control in such trade or business or property of 50 per centum or more remains in the same persons, or any of them, then no asset transferred or received from the previous owner shall, for the purpose of determining invested capital, be allowed a greater value than would have been allowed under this title in computing the invested capital of such previous owner if such asset had not been so transferred or received: Provided,, That if such previous owner was not a corporation, then the value of any asset so transferred or received shall be taken at its cost of acquisition (at the date when acquired by such previous owner) with proper allowance for depreciation, impairment, betterment or development, but no addition to the original cost shall be made for any chaise or expenditure deducted as expense or otherwise on or after March I, 1913, 'in computing the net income of such previous owner for purposes of taxation.
None of the assets, either tangible or intangible, which were paid in to the corporation either for stock or otherwise cost Symington anything. Under the limitations of this provision the corporation apparently had no invested capital when organized. The invested capital can therefore be determined as nonexistent, and the petitioner does not fall within subdivision (a).
In the petition, it is alleged that the Commissioner erred in determining that the contracts in question were cost-plus Government contracts, apparently because petitioner wished to argue that it fell within subdivision (d) of the Act. In its brief, the whole argument is with respect to subdivision (a) and we are without any help in determining what Congress meant by the words “cost-plus.” Reference to standard and law dictionaries and to the committee reports on the Act throw no light on their meaning. Texts on accounting, however, use this phrase to distinguish from the “ lump-sum ” basis. Here the petitioner was to recover its costs in any event and, in addition, a further amount. The word “plus” indicates addition, and the phrase “ cost-plus ” would ordinarily include what we have here; a provision for the payment of cost and something additional. We conclude that the income was derived on a cost-plus basis from a Government contract made between April 6, 1917, and November II, 1918, and that the petitioner is not entitled to have its tax com *145 puted under section 328 by reason of any abnormal conditions affecting its income or capital.
It is not contended that petitioner falls within either of the other subdivisions of section 327.
Reviewed by the Board.

Decision will he entered, for the respondent.